CLAY, Circuit Judge,
concurring in part and dissenting in part.
I concur in Section II, parts 2 and 3 of this opinion denying vicarious liability to the insurer, State Volunteer Mutual Insurance Company (“SVMIC”), and I also concur in part 4, and the finding that the district court erred in not granting Defendants’ motion for summary judgment on the abuse of process claim. I dissent as to the remaining parts regarding the interference with a business relationship, and procurement of a breach of contract claims, and would grant Defendants’ motion for summary judgment as to all claims.
As a preliminary matter, this action should be dismissed for lack of jurisdiction. As noted by the majority, Plaintiffs brought this suit in federal court pursuant to diversity jurisdiction, which requires that the parties be citizens of different states and that the amount in controversy exceed $75,000. The majority correctly states that the sum claimed by the plaintiff controls if the claim is apparently made in good faith, and the ease cannot be dismissed for not meeting the “amount in controversy requirement” unless it appears “to a legal certainty that the claim is really for less than the jurisdictional amount.” Rosen v. Chrysler Corp., 205 F.3d 918, 921 (6th Cir.2000). The majority incorrectly concludes, however, that “nothing indicates that [Plaintiffs] could not in good faith claim the jurisdictional amount at the time they filed their complaint” and that we should, therefore reach the merits of the case. To the contrary, it appears to a legal certainty that the claim really is for less than the jurisdictional amount and that Plaintiffs cannot in good faith claim that the jurisdictional amount has been met. A plaintiffs “good faith in choosing the federal forum is open to challenge not only by resort to the face of his complaint, but by the facts disclosed at trial, and if from either source it is clear that his claim never could have amounted to the sum necessary to give jurisdiction there is no injustice in dismissing the suit.” Gafford v. General Elec. Co., 997 F.2d 150, 157 (6th Cir.1993). “Indeed, this is the court’s duty under the [Judiciary] Act of 1875.” Id.
It would not be an injustice to dismiss this suit where it appears to a legal certainty that Plaintiffs cannot meet the jurisdictional amount. In the complaint, Plaintiffs claim damages for the loss of “the use and benefit of significant amounts of time, effort, money and other professional resources associated with the prior business relationship with Dr. Scott,” and Plaintiffs further claim that they incurred additional expenses in their efforts to seek another expert to replace Scott. (J.A. at 23-24.) Plaintiffs allege damages in excess of $75,000 on all their individual tort claims, treble damages on the inducement to breach of contract and intentional interference with a business relationship and coercion of witness claims, and also seek punitive damages. Despite these contentions, however, Plaintiffs have not provided this Court or the district court with any starting point for estimating damages for the purpose of establishing jurisdiction. All *990 we know is that Plaintiffs paid Scott $25 per hour for his clerical services and $175 per hour for his “opinions.” As of 2000, Scott estimated that his fees totaled approximately $4000. We do not know how many hours Plaintiffs claim Scott worked in total or how much they had to pay the new expert, nor how much time and money was expended procuring the new expert. It seems clear, however, that at a rate of $175 per hour, even with treble damages, Plaintiffs still could not make a good faith claim of $75,000 in damages as a result of the loss of Scott as a witness. Consequently, we should refrain from reaching the merits of this cause of action and dismiss as a result of Plaintiffs’ inability to meet the “amount in controversy” requirement of § 1382.
Although I conclude that jurisdiction is lacking, we could, in the alternative, reach the merits and reverse the district court’s denial of Defendants’ motion for summary judgment as to all claims and dismiss the action for failure to state a claim upon which relief could be granted. It does not appear that Defendants Teresa Sigmon and the Sigmon law firm have done anything wrong, and it is extremely troubling that Plaintiffs are being permitted to utilize these tort claims to punish an attorney who did nothing more than to zealously represent her client and investigate and litigate her case in an appropriate manner.
It was Defendant Teresa Sigmon’s right and duty to ascertain the capacity in which Scott would be testifying and his appropriateness as a witness. The Tennessee Rules of Professional Conduct state that “[a] lawyer shall act with reasonable diligence and promptness in representing a client” Tenn. Sup.Ct. Rule 8, Canon 1.3 (2005). The comments to this rule provide that:
A lawyer shall pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer and may take whatever lawful and ethical measures are required to vindicate a client’s cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client’s behalf.
Id. The record reveals that Sigmon’s actions were nothing more than those of an attorney properly and zealously representing her client.
Plaintiffs initially identified Scott as an expert witness. After Defendants challenged Scott’s suitability as an expert, the trial court ruled that Scott could not testify as to the applicable standard of care. Defendants subsequently deposed Scott, at which time Scott revealed that he was employed by the FDA and was testifying as a fact witness, not an expert witness, and that the FDA in fact prohibited him from testifying as an expert witness. Scott also testified during the deposition that his supervisor at the FDA, Cornelia Rooks, was aware of his participation in the trial as a “consultant and witness of fact.” (J.A. at 129.) Scott further stated that he was uncertain whether or not he would be testifying at trial, but that the FDA had not yet approved him testifying and he did not know the FDA’s policy on whether he would be permitted to testify. As noted above, Scott claimed that at a rate of $25 per hour for clerical work and $175 per hour for opinion testimony, he had been paid approximately $4000 as of July for his services. After the deposition, Defendants again sought to exclude Scott, but Plaintiffs claimed that Scott would be testifying only as a fact witness and would not testify as to the acceptable professional standard of care for physicians. The state court denied Defendants’ motion.
In August 2002, as trial approached, Defendant Sigmon contacted Cornelia Rooks *991 at the FDA via email, and requested information regarding whether Scott had been granted permission to testify in the underlying suit, along with copies of Scott’s employment information and the FDA’s policies regarding the participation of FDA employees in litigation. The matter was referred to the Ann Smith from the department of regulatory affairs, who according to Defendant Sigmon, seemed incredulous about the fact that Scott was being paid for his participation in the suit. Smith requested information regarding the type of opinions that Scott was offering and evidence that Scott had been paid. There were a few more communications between Sigmon and the FDA in which Sigmon repeated her information requests. Ultimately, after being made aware of the circumstances by Sigmon’s inquiries, the FDA forced Scott to withdraw his participation in the lawsuit, with the admonition that as an employee, Scott should not give “ ‘testimony' in outside legal contests that may involve the FDA.” (J.A. at 198.) Internal agency emails reveal that the FDA was troubled by the fact that Scott had been paid for his participation in the trial, and with Scott’s actual role in the case.
Sigmon, in contacting the FDA regarding Scott’s authorization to testify as an expert, did nothing more than fulfill her obligation to represent her client. Once it became apparent to Sigmon that Scott may have been acting outside of his capacity as an FDA employee, it was Sigmon’s duty to do everything legally and ethically permissible to discover whether Scott was exceeding his authorization from the FDA. It should be remembered that Scott had testified that he was complying with FDA guidelines regarding witness testimony by FDA employees. It was also Sigmon’s duty to determine what guidelines the FDA had established for its employees who might be witnesses in order to determine whether such guidelines or instructions might affect Scott’s testimony. In other words, the information being sought by Sigmon was extremely relevant to Scott’s credibility as a witness.
There is absolutely no rule in the Tennessee Rules of Conduct or anywhere else that prohibited Sigmon from contacting Scott’s employer under these circumstances. It seems that Sigmon’s inquiry into whether Scott was exceeding his authority proved justifiable inasmuch as the FDA did in fact pull Scott from the case, apparently because it was troubled by the fact that Scott was being paid and because his role in the trial was potentially viola-tive of government guidelines. Sigmon merely pursued information which was critical to her trial preparation. The fact that the FDA ultimately determined that Scott’s participation in the trial was contrary to its policies was a fact that likely rendered Scott impeachable as a witness— further confirmation that Sigmon was justified in pursuing the matter on behalf of her client.
In preparation of her case for trial, Sig-mon pursued a legitimate course of action after having received conflicting information regarding whether Scott would testify as a fact witness or an expert witness. Again, if Scott was operating outside the permissible bounds of his authority from the FDA, and getting paid when he should not have, then this raised a credibility issue that Sigmon would have been allowed to go into at trial, and she was therefore permitted to investigate the matter. The fact that the state court had ruled that Scott could testify did not moot the issue where it was still not clear whether the FDA had actually agreed to permit Scott to testify, or whether Scott’s testimony would actually constitute expert testimony.
Plaintiffs represented to the state court that Scott was a fact witness, not an ex *992 pert, but represented to the district court and this Court that Defendants interfered with their business relationship with Scott or sought to induce a breach of contract by depriving them of a retained expert witness. These are wholly inconsistent positions, and Plaintiffs should not be permitted to bring suit in tort against opposing counsel for trying to ascertain the status of a witness about which Plaintiffs themselves have been vague and contradictory. If, as Plaintiffs claim, Scott was only a fact witness, then Scott should not have been paid for his services. If Scott was a mere consultant, then perhaps Scott should not have been deposed or allowed to testify as a witness since presumably his only role would have been to assist Plaintiffs’ attorneys in the preparation of their case. It would appear that Plaintiffs themselves were the source of the confusion regarding Scott’s role in the case, which should preclude them from being allowed to sue Defendants in federal court for these torts.
Furthermore, it is an abuse of the adversary system to pursue these types of claims against opposing counsel for actions legitimately undertaken by them in furtherance of the litigation, and these claims should all have been dismissed on summary judgment. The majority argues that Defendants’ actions technically meet the elements of the torts of intentional interference with a business relationship and inducement and procurement of breach of contract; however, even if Plaintiffs’ claims technically fit within the legal framework of these torts, that does not mean that these are not frivolous and improper claims. These claims arose out of actions that were legitimately undertaken by counsel in the course of litigation, not as a result of business dealings, and are not the proper subject for a lawsuit in this context.[3] Plaintiffs employed Scott as a fact witness or consultant or expert, depending on which of Plaintiffs contentions one believes. Plaintiffs did not have a business relationship with Scott in the traditional sense of the word, and Defendants did not interfere with a business relationship or procure a breach of contract. Defendant Sigmon was merely investigating a witness for the opposing side in preparation for trial. Sigmon was concerned with the potential impact of Scott’s testimony on her client’s case and she acted within the bounds of professional responsibility in investigating whether he had permission from the FDA to testify, and in what capacity.
In concluding that Plaintiffs should survive summary judgment on the intentional interference with a business relationship claim, the majority relies upon the holding in Trau-Med of America, Inc., v. Allstate Insurance Co., 71 S.W.3d 691, 701 (Tenn.2002), in which the Tennessee Supreme Court held that Trau-Med had in fact stated a claim for tortious interference with a business relationship against defendant Allstate, whom plaintiffs were seeking to hold vicariously liable in tort. What the majority fails to note, however, is that Trau-Med involved an actual claim that plaintiffs business interests had been affected as a result of Allstate’s interference. Specifically, Trau-Med claimed that Allstate “interfered with six specific actions filed in the Circuit Court of Shelby County by making false statements about the pro *993 priety of Trau-Med’s business and by threatening to protract the litigation process” and as a result of this conduct, “‘[p]laintiff-attorneys claimants, and others, ... because of fear of litigation and other reasons, [have been induced] not to refer persons and to discontinue use of plaintiffs clinic’ ... [and] this improper interference with its existing business relationships resulted in substantial economic harm to Trau-Med.” Id. at 701-02.
In contrast, Plaintiffs here do not allege economic harm to an actual business interest. Plaintiffs’ only claim is that as a result of Defendants’ actions, they lost and had to replace a key witness. That is not the type of business relationship contemplated by the Tennessee Supreme Court to sustain a claim of intentional interference with a business relationship. The Trau-Med court, in expressly adopting the tort of intentional interference with a business contract, provided guidance as to its potential uses by referring to § 766B comment c of the Restatement (Second) of Torts, which provides:
The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. Also included is interference with a continuing business or other customary relationship not amounting to a formal contract.
Traur-Med, 71 S.W.3d at 701 (emphasis in original). Nothing in the language of the Restatement cited above would lead to the conclusion that this tort should be applied to the situation at hand, and I would, as a consequence, have granted Defendants’ motion for summary judgment.
In conclusion, Plaintiffs’ claims should be dismissed for not meeting the jurisdictional amount, or in the alternative, for failing to state a claim upon which relief can be granted.

. Other jurisdictions within this Circuit have in fact held that attorneys are immune from liability to other persons for conduct that arises from acts performed during representation of their clients. See, e.g., Dowling v. Select Portfolio Servicing, Inc., Slip Copy, 2006 WL 571895, *8 (S.D.Ohio) ("Under Ohio law, attorneys enjoy immunity from liability to third persons arising from acts performed in good faith on behalf of, and with the knowledge of, their clients.”).